THE PEOPLE, *ex relatione* M'KINCH and others, *vs.* THE DIRECTORS AND COMPANY OF THE BRISTOL AND RENSSELAERVILLE TURNPIKE ROAD.

In an *information in the nature of a quo warranto*, filed against a turnpike company, a *replication* that the road of the company had not, *at any time within seven years* after the passage of the act of incorporation, been kept faced with gravel or broken stone of a certain depth, in such manner as to secure a firm and even surface, rising in the middle by a gradual arch, is a good and sufficient answer, to the plea of the defendants setting forth their charter, and alleging that *within five years after* the passage of the act of incorporation, they completed the construction of the road, which was approved by commissioners appointed by the governor, who granted a *license* to the company, to erect a turnpike and demand tolls—the certificate of the commissioners and the licence of the governor, and no bar to this proceeding in the name of the people.

*It seems* however that the certificate and licence would be conclusive upon individuals, as to the question of the right to take toll.   Where the cause of forfeiture alleged, is the *omission to keep the road in repair*, it must be alleged in the replication, that the company had permitted the road to fall into such a state of decay or dilapidation, as rendered it *dangerous* or *inconvenient* to travellers ; it is not enough to aver that the company *did not keep and maintain* the road to a certain width bedded with stone, and to a certain depth *faced with gravel*, as originally required.

So it is not enough to allege in a replication, that the company had not put up *fenders* where the road was not of full width, without averring at the same time, that the situation of the road in particular places on its route, was such as to require fenders.

[ *223 ]   *An *information* lies for any cause of seizure or dissolution; the remedy is not limited to *scire facias*.

A ground of forfeiture existing at common law, may be insisted on, although not embraced in the 39th § of the revised statutes, on the subject of *informations*.

It is no answer to an information that individuals aggrieved, have their remedy by *private action ;* or that *the gates of a turnpike company may be thrown open* by public officers when the road is so much out of repair as to amount to a nuisance; or that a *penalty* is imposed for a particular non-feasance, unless the remedy by information is taken away in express terms or by necessary implication.

New-York, May, 1840.—People v. Bristol and Rensselaerville Turnpike Co.

On a motion for leave to file an *information* against a corporation, the court may restrict the *replications* to such matters as are deemed pertinent and true; if such restrictions be not imposed, the defendant, at any time before trial, may apply to have all the matters contained in the replications stricken out, which were not allowed, or at least presented, on the motion for leave to file the information.*

INFORMATION in the nature of a *quo warranto*. The attorney-general, in January term, 1838, filed the information in this case, charging that the directors and company of the Bristol and Rensselaerville turnpike-road claim- ed, and for five years then last past, had claimed to be a body politic and corporate, by the name of " The Directors and Company of the Bristol and Rensselaerville Turnpike Road," and by that *name      [ *224 ] to have the franchise of constructing and maintaining a turn- pike road, beginning at a certain point in the county of Greene, and termi- nating at a certain other point in the county of Albany, and to levy, collect, and receive tolls from all persons using such road; all which privileges and franchises he charged to have been usurped.

The defendants pleaded that by an act of the legislature, passed 25th March, 1808, and by another act amendatory of the first, passed 3d March, 1809, they were constituted and declared to be a body corporate and politic in fact and in name, by the name and style of " The Directors and Company of the Bristol and Rensselaerville Turnpike Road;" that within two years after the passing of the acts, they commenced operations, and within five years from the same period constructed the road specified in the said acts, and completed the same; that after such completion, to wit, on, &c. they gave notice thereof to the then governor of the state, who appointed three discreet freeholders to view the road, and report whether the same was completed in a workmanlike manner, according to the true intent and meaning of the act relative to turnpike companies, passed 13th March, 1807; that a favorable report was made, and the governor thereupon granted a license

* *Propositions advanced by* COWEN, J., *in the opinion delivered by him:*

The state are *estopped* by the *report* of the commissioners and the *license* of the governor, from claiming a forfeiture for a non-compliance with the requirements of an act incorporating a turnpike company, in the original construction of the road.

An information lies against a corporation for a breach of trust, misuser, non-user or neglect of its franchises: but every *non-user* will not furnish sufficient ground of forfeiture. To work a forfeiture, there must be something wrong, arising from *wilful abuse* or *improper neglect*—something more than *accidental negligence*, *excess of power* or *mistake*, in the mode of exercising an acknowledged power.

A single act of *abuser* or *wilful non-feasance* in a corporation, may be insisted on as ground of *total* forfeiture, as well under the statute, as at common law; but a specific act of *non-feasance* not committed *wilfully* or *negligently*; not producing, or having a tendency to produce *mischievous consequences* to any one; and not being contrary to any particular requisition of the charter, will not work a forfeiture.

An abuse in a particular department of an *entire* franchise, is cause of forfeiture of the *whole franchise*; where, however, a particular franchise is added to a corporation, subsequent to its first creation, such franchise may be forfeited and the residue remain.

authorizing and permitting the defendants to erect a gate or turnpike across and upon the road ; and that they accordingly erected a gate and collected toll.   Whereupon they prayed judgment, &c.   The defendants also alleged, that on the sixth day of *April*, 1837, an act of the legislature of this state was passed, authorizing them by their *corporate name*, to make such alteration in the location of their road as would lessen its ascents and descents, preserving the general course of the road, and concluded by praying judgment, &c.

To this plea, the attorney-general put in several replications : in the *fifth* replication, he averred that the defendants did not at any time cause the road *to be faced with gravel or broken stone*, of a depth of not less than nine inches, in such manner as to secure a firm and even surface, rising in the middle by a gradual arch.   *sixth replication :* that *the defendants did not at any time within seven years* after the passage of the act of 25th March. 1808, *caused the road to be faced with gravel,* &c. as in last replication.   *Seventh replication :* that the defendants did not, during the whole or any part of the time mentioned in the information, *keep and maintain a road, twenty-four feet in width of which was bedded with stone,* gravel, sound wood, or any other hard substance, well compacted together, and of sufficient depth to secure a good and solid foundation to the same.   *Eighth replication :* that the defendants did not, during the whole or any part of the time mentioned in the information, *keep and maintain* a road *faced* with gravel or broken stone, of a depth not less than nine inches, in such manner as to secure a firm and even surface, rising in the middle by a gradual arch.   The *tenth replication* was in these words : " And the said attorney general for the said people further saith, that the said directors and company of the Bristol and Rensselaerville turnpike road *did not furnish, nor did they cause to be furnished the lower side of a road, beginning at, &c.* (describing the road authorized by the act of incorporation,) *where the same was not of full width, nor hath such road been so furnished, nor is it now, furnished with a strong and sufficient fender or railing of the height of at least four feet above the surface of the said road,* and this, &c. wherefore, &c.   To these replications, the defendants interposed separate demurrers.

[ *225 ]

*M. T. Reynolds,* for defendants, insisted that the *report* of the commissioners and the *license* of the governor to erect a gate barred a proceeding by information for any deficiencies in the road in its original construction. He also insisted that the act of 1837 was a legislative recognition of the existence of the company, and of its right to avail itself of the franchises granted ; and was also a legislative pardon of all offences previously committed.   In respect to not keeping the road in repair, or rather not *maintaining* it in the same state and condition in which it was at its first construction,

New-York, May, 1840.—People v. Bristol and Rensselaerville Turnpike Co.

he urged, that an omission in that respect, unless the road was permitted to be so much out of repair as to render it impassable, or dangerous to travellers, was not a *cause of forfeiture; that the facing of    [ *226 ] the road with gravel would, of course, after the road was travelled upon, be of a depth less than when at first constructed; but that for such cause other remedies than a forfeiture should be applied: such as throwing open the gate, or procuring an indictment; the punishment should be proportioned to the offence. The replication charging the omission to erect *fenders*, he contended was bad, in not averring a state of facts rendering fenders necessary.

*The Attorney-General*, in answer to the arguments deduced from the commissioners' report, the governor's license, and the act of 1837, in addition to the arguments and in answer to similar grounds assumed in the last case, urged, that the doctrine of *estoppel* was not applicable to a proceeding at the suit of THE PEOPLE, and cited in support of this proposition, *Viner's Abr.* tit. *Estoppel*, (*T*. 2;) 4 *Peters*, 87; 18 *Johns. R.* 226; 4 *Cowen*, 347; 4 *Mass. R.* 258. When a grant is made under a mistake of either law or fact, it may be avoided, and that can be done only by looking behind the grant. This rule applies to a legislative act granting a franchise, and particularly so to executive acts. *Hobart*, 223, 224, 230. 1 *Rep.* 42, 43, 51, 53. The *license* of the governor to erect a gate upon their road may protect the defendants from collateral attacks, but not from an inquiry into their title by *quo warranto*. This writ was formerly called the king's writ of right, which enquires into the right disembarrassed of all formal objections. 15 *Serg. & Rawle*, 127.

The following opinion was delivered by COWEN, J.* By the general turnpike act of 1807, *ch.* 38, and the statutes of that year revised in 1 *R. L.* of 1813, *pp.* 228, 232, § 9, the governor is required to appoint three commissioners, to view and report to him in writing, whether the road be completed in a workman like manner, according to the true intent and meaning of the act; and, on their reporting in the *affirmative, he    [ *227 ] is directed to issue a license permitting the receipt of toll. So far as the question of original completion was concerned, the state thus provided a tribunal to settle it. In the case at bar, that tribunal has answered in the affirmative; the governor, (the agent of the state,) has acted upon the decision, and it is now too late for the people to insist on a review of the question by *information in the nature of a quo warranto*. There was a judicial inquiry on one of the very points now raised, between the state and

---

* Only *part* of the principles laid down by Mr. Justice COWEN were concurred in by a majority of the court, as will be seen at the close of the case; and therefore this mode of stating the delivery of the opinion is adopted.

the company ; and, till the decision be reversed by *certiorari*, it must conclude as between the parties.    Even third persons had no right, after the govenor's license had issued, to refuse payment of toll because the original construction of the road was imperfect ; or, because it had not been completed within the time required by the general act.    Above all, should the state be concluded, after declaring by its delegated judicial agents, that a right to the franchise vested, on the very ground that the road had been finished.    The decision seems to come with all the force of an award by arbitrators, made against the very party who selected the whole board.    An award is of itself a flat bar.    Or if the adjudication in question be regarded as emanating from a court of inferior jurisdiction, it is too late, at least in this country, to say that the decision is only evidence *prima facie*.    *Vide Cowen & Hill's Notes to* 1 *Phil. Ev. and cases there cited, p.* 646, *et seq.* An award of the board of health that the plaintiff's grounds were a nuisance, was held conclusive against him, and in favor of the public.    *Van Wormer* v. *Albany,* 15 *Wendell,* 262.    Could the latter have impeached it collaterally, had the decision been the other way ?    It detracts nothing from the act of the state commissioners, that their decision is to be manifested by a certificate to the governor.    The certificate is in nature of a judgment.    A man obtains a certificate of naturalization.    This has been held but another name for a judgment ; and, therefore, conclusive against all the world on the question of citizenship.    *Spratt* v. *Spratt,* 4 *Peters,* 393.    Suppose such a man appointed to office ; could the evidence of his right to hold, be impeached by *quo warranto ?*    In short, I cannot but regard the [ *228 ]    certificate in question as an *estoppel,* *operating to the same extent as a judgment against the state on writ of *quo warranto,* either after verdict, or confession by the attorney general.    In that case he must ground his claim to forfeiture on subsequent acts.    So I think in this.

I am aware of the freedom with which informations have been employed to review and set aside the decisions of inspectors of election, in every gradation from the town to the county board.    But the office of inspectors is merely ministerial.    On a given concourse of circumstances, well defined by constitution or statute, they are bound to receive, or count votes and give certificates of election.    They have no more discretion than a sheriff in disposing of real estate upon execution.    They may have judicial powers conferred upon them, and then their certificate becomes conclusive.    Thus, in South Carolina, a statute provided that the board of managers [inspectors] should not only ascertain the number of votes given at an election for sheriff, but that on the election being contested, they should *hear and determine* the contest.    In such a case the constitutional court of that state adjudged that the decision of the managers was conclusive upon all questions except those which were jurisdictional.    Therefore, after inquiring and being satisfied that there was a *quorum,* the objection to a want of which was made the on-

ly jurisdictional point in the cause, the court declared that they had no power to proceed by *quo warranto*. *The State* v. *Deliesseline*, 1 *M' Cord*, 52, 61, 64. This was but following out the settled distinction that the decision of a court acting within the limits of its legal power, cannot be collaterally drawn in question ; but only by a direct proceeding, viz. by *certiorari*, writ of error, or appeal. The strongest and most direct illustration which occurs to me in our own reports is, *Wood* v. *Peake*, 8 *Johns. R.* 69, 71, 72. A statute declared that, on the town election of a constable, who refused to serve, and the neglect of the town to elect another within a certain time, three justices might appoint. They having done so, on the professed ground that a vacancy had happened, in a suit against the constable, it was held that the act was judicial, and conclusive on the point of vacancy till it should *be quashed, in a regular course, by *certiorari*. It was [ *229 ] agreed, at the same time, that if two justices only had made the appointment, it would have been void.

But bring down the commissioners below the character of magistrates or arbitrators, and admit they are to be taken as the mere ordinary agents of the state, and we then have a case where the state has inspected and accepted the road as complete, and therefore given an express licence to take toll. It is then presented in the character of saying to this company, by one set of agents, " your road being perfect up to such a time, go on and build a gate and take toll." This the company do, and then the state comes forward by another agent, the attorney general, who sets up the acts done under the license as a breach of condition, and demands that the charter be forfeited. Against an individual who has given such a license the company could allege it, as an estoppel *in pais*. That arises wherever one admits a matter with design to influence the conduct of another, who is thus led so to act that a denial will injure him. I do not cite the cases which sanction and illustrate this doctrine. I had occasion to collect most of them in *Cowen & Hill's* ed. of 1 *Phil. Ev.* notes, *p.* 200, *et seq.* and see 8 *Lond.* ed. of *Phil. Ev.* 378. *to* 384. The principle, as I now state it, is but a repetition of the rule as laid down by Chief Justice Nelson, in *Welland Canal Co.* v. *Hathaway*, 8 *Wendell*, 483. It is perfectly familiar, and the course taken against the defendants, if allowed, will be a palpable violation of it. The rule applies with just as much force against the state as against an individual. I know the answer comes, for we uniformly hear it in such case, that the state may be defrauded ; that it may suppose a state of things to exist, which the defendants knew at the time did not exist. If it were true that the defendants deceived the state agents, that should be shown in the replication. Such a fact would take all force from an estoppel as against any person. On the other hand, if the state agents have knowingly certified an untruth, their knowledge is imputable to their principal, as it would be, had they represented an individual. This would leave the es-

[ *230 ]        toppel in full force.   No *fraud being averred against the de-
                fendants, it ought, upon obvious principles of justice and policy,
to bind the state.   One great object of the proceeding undoubtedly was, to
avoid all pretence for litigation with regard to such trifling defects as cap-
tious relators might raise, at any distance of time.   Indeed to hold the state
concluded, would be no more than to follow the doctrine laid down by Suth-
erland, J. in *The People* v. *Manhattan  Company*, 9 *Wendell*, 381, 2.   To
say that all was fair, until the contrary be shown, or at least averred, is
but to act on the well grounded rule, that honesty and not fraud should be
presumed.   An estoppel *in pais* is not customarily pleaded, but is rather us-
ed as matter of conclusive evidence to establish the facts which it admits.
*Per Abbott, C. J. in  Watson* v. *Wace,* 7 *Dowl.' & Ryl.* 633.   *Per Bayley,*
*J. in  Heane* v. *Rogers,* 9 *Barn. & Cress.* 577.   Being pleaded however,
and the plea notbeing specially demurred to as argumentative, nor avoided by
replication, it may, upon well established principles, be received as a sub-
stantial bar.   The road then, must, I think, be taken to have been complet-
ed within the time required by the terms of the statute, 5 *W. & S.* 56, 7,
§ 14.   And this view if right, disposes of the fifth and sixth replications,
which question the original construction alone.   If it be said that they take
i n any time after the governor's license, though I  think, on a proper con-
struction they do not, still being vicious in part, viz. for the previous time,
are they not bad for the whole ?   1 *Saund.* 28, *and note* (2), *by Serj.*
*Wms ; and see Com. Dig. Pleader*, (*E.* 36), *and* (*F.* 25.)   But I do not
rely much upon this ground.  ·I am aware it may be answered that they
are divisible as to time, and, the demurrer going to the whole cannot, there-
fore, be applied to the bad matter distinct from the good.   *Douglass* v. *Sat-*
*terlee,* 11 *Johns.  R.* 16.   The fifth and sixth replications are, however,
vicious as to the later time for the same reasons which apply to the seventh
and eighth.

        The *tenth* replication is, I think, obviously defective for reasons peculiar-
                ly applicable to itself, and which I will consider bef or e proceeding
[ *231 ]     to take up the 7th and 8th.   The *10th avers that the company
                never furnished the lower side of the road, where it was not of
full width, with a *fender* or railing, but contains no averment that it was in
fact so narrow in any part as to require such deviation from the general mode
of construction.   It is only under peculiar citcumstances that the fender or
railing is required by any statute, *vid.* § 5 *of the act of* 1807 ; and, in
pleading, the condition upon which the company incurred the obligation to
make it must be specifically and substantially alleged.   *Per Sutherland J. in*
*The People* v. *The Manhattan Co.*, 9 *Wendell* 373 *to* 377.   The question also
arises on the 10th replication as covering too much time.   It insists on the want
of a fender, not only *after* but *before* the certificate was made to the governor.
To the point that being bad in part it is bad for the whole, unless it be di-

visible, I have already cited authorities.    It is also vicious, for the same rea-
sons which apply to the seventh and eighth replications, so far as it regards
the time which followed the governor's license.

The seventh and eighth replications are intended to show that the
road has not been *continued* in that precise state of repair which is sup-
posed to be required by the statute.    I do not, however, find any
particular direction there as to what the continued state of repair should
be.    By the fifth section, 5 *W. & S.* 53, and 1 *R. L. of* 1813, *p.* 232, a cer-
tain number of feet is to be *bedded* with stone, gravel, sound wood or
other hard substance, well compacted together, and of sufficient depth to
secure a good and solid foundation.    Then the road is to be *faced* with
gravel or broken stone, of a depth not less than nine inches, in such a
manner as to secure a firm and even surface, rising in the middle by
a gradual arch.    To secure so much, the next section provides for its ex
amination by commissioners, &c. in the manner I have mentioned.    So
much relates to the mode of original construction.    Then the legislature, as
if it were too severe to direct an *exact continuance* of the road in the same
condition, and as if it were impracticable to prescribe the particular state
of repair in all time to come, forbear to give any farther spe-
cific directions on the subject; and *in § 16, 5 *W. & S.* 57, and    [ *232 ]
1 *R. L. of* 1813, *p.* 236, provide for insuring a state of general
repair, through the award of permanent commissioners, to be appointed for
the inspection of turnpike roads.    If these, on complaint, shall pronounce
that the road is out of repair, it must be thrown open, and the right to take
toll is thus suspended, until a commissioner shall certify that it is restored to
a state of sufficient repair.    The provisions of the old general turnpike act
are substantially re-enacted in the last revisal.    1 *R. S.* 581, 584, 587, 2*d.*
*ed.*    Whether a forfeiture of the charter can be insisted on, for a mere na-
ked omission to do any particular act of repair not amounting to the violation
of a duty specifically enjoined by the statute, admits of very serious doubt.
The act concerning informations in nature of a *quo warranto*, requires the
attorney general to institute proceedings by such information when the
corporation shall offend against the provisions of a statute creating, altering
or renewing it, for illegal misuser, or forfeititure by nonuser, or when it
shall exercise a franchise or privilege not allowed by law.    2 *R. S.* 483, §
39, 2*d ed.*    But the case is brought within none of these provisions, by eith-
er the seventh or eighth replication.    They would either of them be satisfied
by showing that the road had, in a course of several years at any point of
time, come short of the precise *bedding* and *facing* prescribed for the out-
set.    I do not deny that the statute must be regarded incidentally as point-
ing out what the permanent condition of the road should be, as that the com-
pany should keep up fenders in places requiring them.    But it contains no
direct enactment that the road shall, in any respect, be continued precisely

as it were originally constructed. I concede, that for any of the offences enumerated by the revised statutes as grounds for filing an information, a corporate charter may be dissolved. But the seventh and eighth replications fail to make out any of those offences. The defects which they allege may exist to some extent, and yet the road be in a good state of general repair. To keep it in that state is all the company are bound to do. That was a duty which the common law imposed, not the statute, in respect to the *privileges deviable from the act by which they were incorporated. The public is therefore bound to show that the company had at least permitted their road to fall into such a state of dilapidation as rendered it dangerous or inconvenient to the traveller.

[ *233 ]

A question has also been started in this and some other causes now under advisemement, and which may as well be considered here, whether, at this day, any act of abuse or non-feasance or any consequences arising from such act can be insisted on as a ground of forfeiture, unless it can be shown to come within the terms of the 39th section cited. That section contains no negative words, nor does it use language indicating an intent to cut off any of the ancient grounds on which the remedy by information was founded. These were well understood, and had been often recognized by a long series of decisions, from the great case of the *City of London*, 3 *Hargr. St. Tr.* 546, down to the time when the revised statutes passed ; and will be found, I apprehend, to embrace not only the same but considerable other ground beside that on which section 39 makes it the special duty of the attorney general to file an information. This will at once be seen by the language of the modern books.

The grounds of forfeiture sanctioned in the case of the *City of London*, were an abuse of corporate power, by exacting illegal tolls and presenting a seditious petition to the king, either of which was holden sufficient. In *Rex* v. *Pasmore*, 3 *T. R.* 244, Ashurst, J. speaks generally of an *abuse of power* and *delinquency*, as a ground of dissolution. Parsons, Ch. J. says *malfeasance* or *non-feasance*. *Commonwealth* v. *Union Fire and Mar. Ins. Co.* 5 *Mass. R.* 232. *Vid. also Willcock on Mun. Corp.* 334, § 867 *and* 868 ; *and Ang. & Ames on Corp.* 510. Blackstone mentions *negligence* or *abuse of franchises*. 1 *Black. Com.* 485. *Non-user* or *neglect*, said Ashurst, J. in *Rex* v. *Amery*, 2 *T. R.* 515, 567. " A corporation may be dissolved, for it is created upon a trust ; and if that be broken, it is forfeited," said the king's bench, in *Sir James Smith's case*, 4 *Mod.* 53, 58, 1 *Show.* 280, *Skin.* 310, *S. C.* Holt was then chief justice *and participated in this declaration. Again : the city of London held by charter or patent the shrievewick of London and Middlesex ; and in *London* v. *Vanacre*, 12 *Mod.* 270, 271, Lord Holt, speaking on this subject, said : " If they do not make such an election as their letters patent appoint, it is a forfeiture of the franchise ; for all franchises are granted on condition

[ *234 ]

New-York, May, 1840.—People v. Bristol and Rensselaerville Turnpike Co.

that they shall be duly executed, according to the grant; and if they neglect to perform the terms, the patents may be repealed by *scire facias.*" We may adopt with more confidence the doctrine of the two last cited cases, both of which arose soon after the revolution of 1668, because the question had been then so recently canvassed in the case of the *City of London.* That was a political prosecution, and the defence, or, at least, the spirit with which it was conducted, and the indignant repeal of the judgment by a revolutionary parliament belonging to the same party with Holt, must have led him to concede with the greatest caution, that any ground taken in that case by Charles' judges, was the right one. Yet he expresses, *in terms*, the general conclusion to which they arrived, viz. that a charter of incorporation may be avoided for things by the corporation *done* or *omitted to be done.* 3 *Hargr. St. Tr.* 627. The prosecution of the city had accelerated the revolution under which he held his place ; yet being sensible that the decision was right in principle, he spoke with that integrity which is well known to have formed the law of his mind.

Blackstone, also a disciple of the same revolution, was brought to concede and distinctly to recognize even the practice, as well as the application of the principle, which prevailed in that case. He remasks that for *corporate negligence* or *abuse of its franchises*, the regular course is to proceed against the corporation by information, to inquire by what warrant the members now exercise their corporate power ; having forfeited it by such and such proceedings. 1 *Bl. Comm.* 485. True the question may be still open upon these words, whether you can proceed against it as a corporation *eo nomine*, or must treat it as actually forfeited, and name its members defendants, in their natural capacity, and *by their baptismal names. [ *235 ] London sought to embarrass king Charles by insisting on the latter form, saying it was absurd to charge the city with usurpation by an information which treated them, in the same breath, both as a *subsisting* corporation, and as *usurping the power* to be a corporation. Yet Blackstone plainly hints that the proceeding was in strictness of law, regular. And even Mr. Hallam, notwithstanding the unmeasured terms of reprobation which he justly bestows upon the motives that prompted the measure, does not take upon him seriously to question its legality. 2 *Hall Const. Hist. of Engl.* 611–612. I will only add that Chief Justice Saunders, one of the ablest jurists of Charles', or perhaps of any other reign, concurred in the decision, though he did not finally participate in it, having died the day before the judgment was pronounced.

It is too late with us, to question that, for any cause of seizure or dissolution, an *information*, not a *scire facias* only, is a proper remedy, or that it may be filed against a corporation as such by its corporate name, according to the case of the city of London. The remedy and the form of pleading in that case, was recognized by this court as correct upon common law

principles, in *The People* v. *Niagara Bank*, 6 *Cowen*, 196, 209, and is now expressly adopted by statute for all cases within 2 *R. S.* 483, § 39, 2*d ed.*

But to proceed with the general grounds of forfeiture : In *Slee* v. *Bloom*, 5 *Johns. Ch. Rep.* 380, Chancellor Kent said, that a corporation can be dissolved for a breach of trust is no doubt the settled doctrine at this day.    In *Turret* v. *Taylor*, 9 *Cranch*, 43, 51, Mr. Justice Story said, " a private corporation, created by the legislature, may lose its franchises by a *misuser* or *nonuser* of them ; and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture.    This is the common law of the land, and is a *tacit condition* annexed to the creation of every such corporation."    The result of the cases seems to be, that a corporation must come up to all the substantial objects for which

[ *236 ]     it was instituted.    If it depart from any one of these, it is guilty of a breach of trust.    It was made a political body on the *implied condition that it should demean itself faithfully and honestly in the use of all its franchises.    This principle, with the authorities on which it rests, seems to have been very well considered in the great case of the *Chesapeake and Ohio Canal Company* v. *The Baltimore and Ohio Rail Road Company*, lately decided by the court of appeals in Maryland, 4 *Gill & Johns. R.* 1.    The opinion of the court, which was delivered by Chief Justice Buchanan, so far as it is material to the subject before us, will be found at pages 106, and 121.    The question was one of *nonuser ;* and the drift of the argument is, that the corporation had not, at any rate, been guilty of a fraudulent or wilful nonuser, or such, at most, as resulted from gross negligence.    The words of the chief justice at p. 121, are, " It may be dissolved by a forfeiture of its charter, through abuse or neglect of its franchises, as for condition broken ; there being a tacit condition in every such grant, that the corporation shall act up to the end of its institution."    At p. 107, he says, " nor is it every nonuser that will furnish a sufficient ground for a judgment of forfeiture."    That must, it appears to me, be so in the nature of things.    A mere nonuser, or suspension of all action, may be even laudable for a time.    This is well illustrated in the Maryland case.    To work a forfeiture, there should be something wrong ; and not only a wrong, but one arising from wilful abuse or improper neglect.    An inability, through misfortune, to answer the design for which the body politic was instituted, is also cause of forfeiture.    That, however, is on a distinct reason, not so directly material, and of which it is not necessary to say much.    The prosecution before us goes on corporate default, or corporate wrong, which must, I think, be more than accidental negligence, or a mere mistaken excess of power, or a mistake in the mode of exercising an acknowledged power. There must be an abuse of trust somewhat of such a nature as would render a trustee liable to forfeit his station, on the complaint of his *cestui que trust*,

if the question stood on the relation between them. Corporations are politi-
cal trustees. Have they fulfilled the purposes of their trust, or
acted in good faith with a view to their fulfilment, is the *ques-     [ *237 ]
tion to be asked, when they are called on to forfeit their
charter,'either for acts of commission or omission ; unless indeed they are
so generally crippled and broken down in their affairs, as, in the judgment
of a court and jury, to be incapable of prosecuting their business with safe-
ty to that community who granted the charter, and who hold the relation of
*cestui que trust.* Woodworth J. in People v. *The Washington and Warren
Bank,* 6 Cowen, 215, 16. The Same v. *The Hudson Bank,* id. 217. An
executor or guardian would be removed for culpable misconduct, positive or
negative ; so for insolvency, insanity or other incapacity, but not for mistake
or accident. Buller, J. in *Rex* v. *Pasmore,* 3 *T. R.* 246, puts the matter
thus : " There is a *compact* between the crown and a certain number of his
subjects, the latter of whom undertake, in consideration of the privileges
which are bestowed , to exert themselves for the good government of the
place. Now, if those persons have so far violated their trust, by negligence
or misconduct, that they are no longer capable of governing the place, there
is an end of the compact. The ground of the charter was the government
of the place." *See also Dartmouth College v. Woodward, per Washing-
ton, J.,* 4 *Wheat.* 658 ; and farther, 2 *Inst.* 222 ; 1 *Show.* 280 ; Skin.
310.

The main effort, however, in this and several other causes now under ad-
visement, has been to show that, however wretchedly the corporate trust may
have been executed in some particulars, this is, in itself, no cause of forfeit-
ure beyond the immediate department of abuse ; that the offence does not in-
fect the whole body corporate ; but that, in some way, punishment should be
limited and proportioned to the single fault or the several faults. On this
point, viz. what acts of usurpation or other abuse, non-user or nonfeasance,
&c. shall work a total forfeiture of the corporate charter, cases since that of
the city of London have not been explicit. No intelligible system of practi-
cal doctrine can perhaps be drawn from them ; and while more may be said of
the older authorities, they dealt mainly in franchises not corporate. A cor-
poration may be created with all the incidental powers of such
a body, powers to elect officers, use a *common seal, collect tolls, &c.     [ *238 ]
being an entire and indivisible body of itself, a franchise which
must stand or fall with any one of its powers, *vid. Palmer,* 82 and after hav-
ing been administered for many years, a particular franchise may be added.
The latter being forfeited, there may then arise a question whether it be not
so obviously distinct that it may be cut away by information, without impair-
ing the main body. This, it seems, may be done. In *Rex* v. *Gregory,* 4
*T. R.* 240, 242, n. (a), Lord Mansfield said, " every college is a corpora-
tion in itself ; and altogether, they form one corporation in the university in

gross.  In *The City of London* v. *Vanacre*, 12 *Mod.* 270, it appeared that, long after the city had been incorporated, King John granted to it the shrieve-wick of Middlesex, &c. by letters patent.  This was a distinct franchise, the neglect or abuse of which might result in a forfeiture of that alone ; and the remarks of Holt, at page 271, keep this idea in view.  Again, in *Sir James Smith's case*, he is speaking of usurpation of a liberty, and he says there may be a seizure of the liberty which will not warrant either the seizure or dissolving of the corporation itself.  In this latter respect he may be considered as dissenting from the case of the city of London.  He cites no authority.  Yet, in some measure, the distinction must be kept in view.  *Vin. Abr. Prerog.* (*Y. c*), *pl.* 19.  The older cases go upon the same distinction, though few if any, I apprehend, can be found which deny that usurpation in any respect is generally a cause of total forfeiture, or that mal-administration, or non-feas-ance in one department of an entire franchise shall have the same effect ; and I take it that reasoning by analogy from the old books is, in this matter, perfectly correct ; for the remedy by writ and information were exactly commensurate.  *Vid. Com. Dig. Quo. Warranto* (*A*), (*B*) *; Bull. N. P.* 210, *Lond. ed.* 1788 ; 2 *Morg. Att. Vad.* 103, *Lond. ed.* 1787 ; *Tilghman, Ch. J. in Commonwealth* v. *Arrison*, 15 *Serg. & Rawle*, 127, 130 ; *Spencer, J. in People* v. *Utica Insurance Co.*, 15 *Johns. R.* 387 ; *Tilghman, Ch. J. in Commonwealth* v. *Murray*, 11 *Serg. & Rawle*, 73, 4.  It is said in *Lilly's Abr. Quo Warranto C.* : " If several privileges are granted in a charter ; and there is a for-[ *239 ]  feiture *of the charter for an abuser of one of the privileges, and a *quo warranto* is brought, and judgment upon it, this is a forfeiture of the whole charter."  *Vin. Abr. Prerog.* (*C. d.* 4.) *pl.* 20. *S. P.*  Neither cites any authority ; but this is the very doctrine in the case of the *quo warranto*, against the corporation of Maydenhead, *Palm.* 82. and *Vid. Vin. Abr. Prerog.* (*Y. c.*) *pl.* 18.  *Id. Market* (*F.*) *pl.* 7. 8.  *Toll* (*H.*)  To subsist as a body politic or corporate, is a franchise ; which last word means, any royal privilege in the hands of a subject, as to hold a court leet, have a manor or lordship, to have waifs, wrecks, estrays, treasure trove, royal fish, forfeitures and deodands ; to have cognizance of pleas, a liberty or exclusive jurisdiction ; to have a fair or market ; to have the right of taking toll, to have a forest, chase, park, warren or fishery, endowed with privileges of royalty.  2 *Bl. Comm.* 37, 8.  These and the like, were in ancient times very numerous ; and those who held them, were constantly seeking their enlargement, a state of things which called for the exertion of great and continued vigilance, by the attorney general, and other officers of the crown, in preventing their abuse.  They were under the special surveil-lance of the justices in Eyre ; and a practice seems to have prevailed, of passing and having them allowed by those justices, as they perambulated the kingdom.  The mere fact of not coming in, and promptly showing claim,

whenever the attorney general chose to send out a writ of *quo warranto*, was a very common cause of forfeiture. Many times he would confess the claim, and then the king stood concluded as to his right; but this was still liable to be drawn in question, for subsequent abuser, or nonuser. Very strict rules prevailed as to the manner in which franchises were to be exercised; and, considering the nature of some of them, it was necessary that it should be so. Some were to hold courts, have a bailiwick where process exclusively ran, and to have goals for the keeping of prisoners. When the courts became dilatory or corrupt, when bailiffs became negligent, or oppression was practised against prisoners, in short, whenever a greedy irregularity or excess exhibited itself in pursuing any of the numerous *objects of such gainful monopolies, or acts of carelessness and     [ *240 ]
negligence indicated a settled indifference to them, they were
held forfeited to the crown, the first being imputed as an abuse, and the last as a sort of lapse. In times of feudal barbarity which accompanied and followed, for many years, the overgrown power of the nobles, there was constant occasion to apply the corrective of the *quo warranto*. It was the only effectual remedy, even if it could be called a remedy in itself; for monopolies had become so numerous, and so fortified by interest and power, that the application of the writ depended in greater measure on the personal character of the prince, than moral submission to the law. This was especially so, when the writ was brought to bear upon manorial claims residing in the hands of the barons or lords either temporal or spiritual. Looking at *Keilwey's reports* of " cases in Eyre, in time of the very memorable king, Richard the Third," *fol.* 137 *to* 152, one would be led to believe that a good deal of his reign was devoted to this sort of judicial contest with his nobles. Indeed, his predecessor, Edward the first, had found single writs too slow; and caused a statute to be passed under which his noblemen were called by proclamation and obliged to come by squadrons before his immediate court or his justices in Eyre, whenever they entered the county. 2 *Reeves' Hist.* 220, *Dubl. ed.* 1787. *Com. Dig. Quo Warranto*, (*C.* 2.) *Crabb's History of the Engl. Law*, 174, 5. This bearing too much the appearance of plunder, another statute was passed somewhat moderating the proceeding, and bringing it back to about the common law course. 2 *Reeves' Hist. ed. before cited*, 221. *Crabb, ut supra.* This is the statute on which Sir Edward Coke has furnished us with a labored commentary in his 2 *Inst.* 294. Still, as appears from the history of the times, the writ continued to be a very common resort, and to have been almost avowedly used to strengthen the crown at the expense of the barons. It was sometimes extended even to lands, though *Coke* shows that its proper office respected franchises only. Pursued in such a spirit, it may be true that the consequences claimed were occasionally severe *and disproportioned to     [ *241 ]
the offences alleged. The pursuit being also sometimes more

stringent, and sometimes more lax, when the case of the city of London came to be argued, it is not surprising that authorities should be found conflicting on the question whether you could go merely for correcting some particular abuse, or claim a forfeiture of the whole franchise on that ground. Several distinct franchises, though in the same hand, might be severed by judgment: and the extending of the writ to land must have increased the confusion, this being so easily divisible from the incidental prescriptive franchise. Judgments must therefore, often have been given in the same cause, for the king in respect to the latter, leaving the former still in the hands of the subject. The instance put in argument, that, for the abuse of a tenant by the commission of waste, the landlord shall recover only the place wasted, finds an answer in the divisible nature of the subject. The difficulty was probably increased by the crown many times suing merely to cut off an extravagant claim made in respect to a single franchise, being willing to leave the acknowledged franchise untouched, even in cases where total forfeiture might have been claimed. The question will be found to have been a good deal examined in the case of the city of London, by Finch, solicitor general, 3 *Harg. St. Tr.* 549, 50, for the crown; by Sir George Treby recorder of the city, contra, *id.* 565 to 567 ; and by Sir Robert Sawyer, attorney general, in reply, *id.* 599. The latter said that, to forfeit the toll illegally taken, is idle ; it is no punishment, for they never had any right to it. They can be punished only by taking away their acknowledged rights. *Vide also Comyn's Dig. Franch. (G 3.).* Some of the distinctions depending on the divisible character of the subject are noticed in *Viner's Abr. Franch. (E).* Other pertinent rules are there laid down : " A man has franchises and uses more than he ought : this is a forfeiture ; but if he uses less, this is finable." *Pl.* 1. He who has fair to hold two days, and holds it three days, forfeits the whole fair. So where a man has market to hold the Saturday, and he holds it another day." *Pl. 3, marg. and pl.* 9.

[ *242 ]  " If *a lord refuses to do a thing according to his franchise, or does contrary to his franchise, or misuses it, by himself, his bailiff or deputy, or non-uses the franchise, the franchise shall be reseized." *Pl.* 7. He puts several abuses in respect to prisoners in jails held within a franchise or liberty, viz. groundless detention, or repeated escapes, as a reason of forfeiting the whole liberty. *Pl.* 4, 10. So oppression arising from gross ignorance of the judge as to the nature of crime, or his usurpation by repeatedly issuing a *capias* where he has jurisdiction of *summons* only, or for inflicting illegal punishment. *Pl.* 13, 15, 16. So of non-feasance—as if the lord having liberty of jurisdiction, refuse to attend the justices of assize in person or by deputy ; and so the not having able officers, judicial and ministerial, with the proper instruments of punishment, or omitting legal punishments after conviction. *Pl.* 8, 13. He winds up with the general remark of Lord Holt, which I before cited from 12 *Mod.* 271. Under the

same title, (A) pl. 3, he lays down what must be a very general, if not an universal rule, that franchises cannot be divided if they are *entire*. To all the cases put, he cites the authorities. In *Earl of Shrewsbury's case*, 9 Rep. 50, much of the doctrine, as noticed in *Viner*, is summed up; and what acts of non-feasance shall operate as a forfeiture is examined with reference to the nature of the franchise. In *Bagg's case*, 11 *Rep.* 98, it is said of misfeasance and nonfeasance, that in order to found a proceeding for forfeiture, there must be an *act*, or such *neglect as is tantamount ;* and an instance of the last is a game keeper, and game being killed in consequence of his negligence. There he shall lose his office.

The ancient authorities, when looked into on the point of divisibility, and applied to a corporation, must now all be received subject to the case of the city of London. There the taking of an illegal toll was held sufficient to work a total forfeiture of the city charter, with its thousand franchises. *Vid. a summary of that case,* 2 *Show.* 263 to 279, *marg. page and note* (t), *Lond. ed.* 1794. The entire roll is given in 6 *Harg. St. Tr. app.* 15 *to* 39, including at the last page judgment of general and absolute seizure. The corporate *abuse which is to work a forfeiture, 　[ *243 ] therefore, need not be of any particular measure or extent.

The writ and information were crown remedies ; and in the historical sketch already given, will be seen to have been sometimes pushed beyond their proper bearing against the subject. So far they should be taken with grains of allowance. Sometimes, however, they were unreasonably narrowed in the hands of weak princes ; but they have been steadily recognized as in general of most salutary effect in favor of the commonwealth, and in a view to this have been sustained by the courts as important remedies, in nature of writs of right. *Comyn's Dig. Quo Warranto*, (A).

That the franchise of being a corporation for one general purpose, as to erect and make profit from a turnpike, to bank, insure, or the like, comes within the doctrine which denies that a franchise is divisible, would seem to be quite plain. Indeed, that was hardly denied in the argument of this particular case. But when we came to hear the arguments of *The People* v. *The Hillsdale and Chatham Turnpike Company*, *post*, 254, and *The Same* v. *The Kingston and Middletown Turnpike Company*, *ante*, 193, especially the latter, it was much insisted on that the government could go only by detail, lopping off a branch here and a branch there, in the particular department of abuse ; and above all, it was said that taking excessive toll would not be a cause of general forfeiture, for that, at least, might be severed, and the company cut off from the obnoxious branch, without impairing any of the real franchise. But this I think may be left to the argument of Sir Robert Sawyer, already quoted, and the judgment rendered against the city of London. Counsel have cited *Cruise's Dig. Tit.* 27, *Franch.* § 89 *to* 95, which is but a summary of part of the doctrine already noticed in

*Viner ;* and, when taken subject to the proper distinctions, will not save a corporation from general forfeiture, either for abuse or non-feasance in any particular.	*Vid. also* 1 *Wool. Lect.* 500.

Another method of redress pointed out in the later arguments, as exclusively applicable, and somewhat insisted on in the first, is that by [ *244 ] *private action.* We are told that if *the road be too narrow, or ill constructed, or out of repair, or excessive toll be taken, any individual who suffers an injury, may have his action. *Townsend* v. *The Susquehannah Turnpike Co.*, 6 *Johns. R.* 90, and *The Goshen and Sharon Turnpike Co.* v. *Sears,* 7 *Conn. R.* 86. Both these cases seem to have gone on statute liabilities of the company ; but there is no doubt that an action lies and always did lie against the corporation, for mischief to an individual, arising either from misfeasance or non-feasance. The length of the argument will therefore be readily seen ; and it is quite too much. It seeks to show that there never can be, and never could have been, a writ of *quo warranto,* or any information in nature of such writ, for an abuse or nonuser of franchises, corporate or otherwise ; for the great complaint always was, that these offences were mischievous to individuals, and yet the public remedy was never questioned on that account. That a statute creating the right to have a bridge with a draw, imposed a penalty for unnecessary delay in raising the draw, was certainly urged as an argument against the delay working a forfeiture, by a very learned court. *Commonwealth* v. *Breed,* 4 *Pick.* 460, 465; and a provision of that kind may, no doubt, be so introduced into such a statute as to indicate a clear intent that it shall furnish the only remedy. But it is a rule of almost universal application, that if a statute fixing a penalty for an offence, do not either expressly or by necessary implication cut off the common law prosecution or punishment for the same offence, it shall be taken to intend merely a cumulative remedy. No case ever held, as a general position, that a right of private action for a misdemeanor, is at all incompatible with the remedy at the suit of the people. The principle now contended for, was urged in *London* v. *Vanacre,* 12 *Mod.* 270, 1. It was held, as we before noticed, that the city must forfeit its franchise of the shrievewick, if it did not elect a sheriff, and compel him to serve. He had refused to serve. Holt said : " As to the objection that he may be indicted for this refusal, as was the case of *Larwood, Sheriff of Norwich,* I answer, that will not be sufficient to hinder the for-[ *245 ] feiture of the franchise, for if there *should be a vacancy when the sheriff comes to be sworn, then there will be an obstruction of justice." The ground was, that a public inconvenience in not exercising the franchise, should work a forfeiture, although there might be another remedy.

I, therefore, agree with the attorney-general, that a *single act* of abuser or wilful non-feasance in a corporation, may, at the common law, be insisted

on by the government, as a ground of *total forfeiture*. And I am inclined to think that, as to causes of forfeiture generally, no discrepancy will be found to exist between the common law and the 2 *R. S.* 483, 2d ed. § 39, whether the latter be read as it is punctuated, or in the light of the law of 1825, *Statutes of that year*, *p.* 450, § 7, from which the revision was in part taken.

This section (39) has before been noticed, but in reference to some strictures which were passed upon it in the course of the later arguments, it may be well to examine it more particularly. It provides that an information may be filed by the attorney-general, upon his own relation, on leave granted, against any corporate body, whenever such corporation shall: 1. Offend against any of the provisions of the act or acts, creating, altering or renewing such corporation; or 2. Violate the provisions of any law by which such corporation shall have forfeited its charter by misuser; or 3. Whenever it shall have forfeited its privileges and franchises by nonuser; or 4. Whenever it shall have done or omitted any acts which amount to a surrender of its corporate rights, privileges and franchises; or 5. Whenever it shall exercise any franchise or privilege not conferred upon it by law; and it shall be the duty of the attorney-general, whenever he shall have good reason to believe that the same can be established by proof, to file such information in every case of public interest; and also in every other case, if satisfactory security shall be given for costs. In both cases, by section 40, leave is to be obtained from this court or one of the justices of this court; and notice of the motion for leave may be ordered. The statute seems rather intended to declare the duty of the attorney-general, than any new ground of forfeiture; and under it we have held that his powers are, in some measure, judicial, that is to say, *when he shall pronounce    [ *246 ] that the public interest does not call for the expense of a state prosecution, the other case, the right of the individual immediately arises. Any one may then peremptorily require him to proceed on securing the costs, and on making out a case satisfactory to the court. One object of the statute was to secure an information at all events. The statute would not, therefore, leave an intermediate class of cases wherein the court might say they are of public interest, although the attorney-general had denied that quality; and so no proceedings be had. The state is estopped by the act of its officer, from insisting that it is a case of public interest, and declining to proceed on that ground. The contrary position would assume, that the attorney-general had not done his duty; that he ought to have proceeded, even without security, which cannot be used as an argument that he shall not proceed at all. This rule was complained of on the argument, as a severe one; but I can not feel that a corporation should, generally, be farther beyond the reach of prosecution for its offences, of whatever character, than a natural person. As the statute stood on the first revisal, it brought

both upon nearly the same level. It first went considerably beyond the statute of 1825, *Statutes of that year, p.* 450, § 7, in its enumeration of corporate offences; and then made it the duty of the attorney-general to prosecute all such offences at the expense of the state, whenever he had good reason to believe that they could be established by proof. *Vid.* 2 *R. S.* 583, 1*st ed.* § 39. This was altered the very next year, *Statutes of* 1830, *p.* 400, § 53, which required him to be governed by considerations of public interest, when acting on state expense; but, in other cases, still to proceed as before, upon individual security. That is the law as it stands in the 2 *R. S.* 483, 2*d ed.* § 39. There can be no doubt that the amendment intended to divide between state and individual expense, the whole that before rested on the former. The last statute mitigated the first, by discouraging prosecutions against corporations for certain offences, a thing which has hardly ever been done in respect to natural persons. So far, I think corporations have not any reason to complain.

[ *247 ]     *I agree, however with the counsel for the *Kingston and Middletown Turnpike Company*, that there may sometimes be abuses, such as multiplying points in a prosecution to a vexatious extent. Whether that case be an instance, it is impossible to say; because all the points may be true, and may have been allowed on motion; they are exceedingly numerous, especially when we add to the number of replications, (thirty in all,) that, as to several of them, each contains within itself as many points as there are replications in the cause. Every inch of the road seems to be assailed on almost every ground that could be thought of; and one of the replications which goes on the claim of excessive tolls is, I have, no doubt, unnecessarily prolix and diversified. It is entirely clear, however, that the court may, either by rule on granting. leave, or on motion by the defendant at any time before trial, restrain the replications to such particular matters as are not only pertinent but shown to be true. We have the same control over this class of pleading as any other; and it does not follow that because a relator may desire that a violation of all the requisitions of the turnpike act shall be stated in the replications, he may retain the whole on the record. Corrections of such abuses are not unknown even to the old method by writ. *Lilly's Abr. Quo. Warranto, B.* The author there states this case as having occurred in 22 *Car. in B. R.* A *quo warranto* was brought for vexation on forty-eight points; and the court being moved in it, did order that the prosecutor should waive that *quo warranto*, and should bring a new one, and therein insist only on three points, but that he might proceed to trial upon his new *quo warranto* in such time as he might have done upon the old, to the end that he might not be delayed in his proceedings by bringing of the new *quo warranto*." It was doubtless a series of such cases as this, that produced, in the course of a few years

after, the statute of 9 *Ann, ch.* 20, placing the allowance of informations concerning offices under the preliminary supervision of the court. *Vide. Bac. Abr. Informations,* (*D.*)   Our statute, as to requiring leave of the court, is much more extensive; it reaches nearly all cases in which the *information lies; and I was surprised on the argument    [ *248 ] to hear counsel say that the moment this court allows an informa- tion to be launched, we lose all control over the pleadings; so much so, that the relator may make as many points as he pleases in his replications. That cannot be so.   It would work a complete evasion of the statute; and, for one, I have no hesitation in saying that the court or judge who allows the information may impose express restrictions; and, if that be not done, it would be the duty of the court, on motion to strike out every matter in the replications which was not allowed, or at least presented, as the ground of motion for leave.   While it is due to the public that every facility should be extended for correcting the real and substantial abuses of corporations; it is but just to the latter, that they should know in due season wherein they are to be assailed; that the issue should be as direct and simple as may be; and above all, after the ground is taken before the court, that the relator should not be allowed to run off upon matter which even *he* thought trivial or obsolete, when he came for leave.   There is no need of going back to a new or original, whether writ or information, as was done in Charles' reign.   This court will, on motion, strike out all replications which make such points as were not originally taken.   I entirely agree that without such a power the information may, in some cases, be unreasonably oppressive.   It is not like an indictment or information against an individual, generally in its own nature confined to a single offence.   Taking the replications now in ques- tion as a specimen, indeed looking at the theory of the proceeding, it may be the means of scrutiny into numerous, minute and unimportant flaws for a long series of years.   True the *onus probandi,* for the purpose of im- peaching the corporate title, lies upon the attorney-general; but in trying a great number of issues arising upon replications interposed without stint, and under the maxim *nullum tempus occurrit republicæ,* for the statute of limitations does not extend to the case, 2 *R. S.* 221, 2*d ed.* § 1; it is by no means improbable that the evidence of many real answers to *prima facie* grounds thus fished up may have been lost through time and accident, or forgotten by the defendants.

   *I have before shown that the case immediately before us does    [ *249 ] not come within the 39th section; and the same thing is true of other corporate offences, which yet I apprehend form a complete ground of forfeiture.   The statute goes to *non-users,* but many *non-feasances* do not amount to non-users.   The statute does not, in its terms, reach negligences unless they have the quality of being within the first subdivision, viz. offences against some provision of the act or acts creating, altering or renewing the charter.   I have already noticed that, after a road has been approved and

New-York, May, 1840.—People v. Bristol and Rensselaerville Turnpike Co.

certified by the state commissioners, the turnpike act does not, and cannot, in the nature of things, require the *continuance* of any specific state of repair.   By neglect it may fall below a condition of reasonable repair ; it may become a nuisance ; and whether the gates be thrown open by law or not, such a condition may well be insisted on as a cause of forfeiture ; yet here is no offence against an express provision of the organic law.   The negligences relate to the general duty of the corporation—thus it may be with a rail road corporation, a canal corporation, &c.   Acts of non-feasance might, on similar principles, be interposed as cause of forfeiture against corporations for manufacturing, or even for literary or religious purposes ; and I do not admit that because, in any of these cases, other remedies exist, therefore the public information will not lie.   That inspectors may throw open turnpike gates, is no argument against forfeiture for a state of non-repair ; the application to them is but a cumulative remedy, ordinarily adopted to be sure, because summary, cheap, and generally efficacious ; but the statute does not forbid the remedy by information, any more than the statute giving a summary remedy to the landlord against his tenant may be said to inhibit the action of ejectment.

Viewing the state of repair as resting on the general duty of the company, I have already noticed wherein the seventh and eighth replications are defective.   . They do not show that the company have fallen short of that duty. But in the later arguments it has been strenuously insisted, that admitting a single act of abuse, or a single omission or non-feasance, or a general state of non-repair, to be a cause of *forfeiture, such a consequence does not necessarily follow ; that the act, omission or event must be owing to some *fault* of the corporation, and hence the replications should affix a quality to them, by averring that, at least, they were *wilful* or *negligent*.   I have already taken some notice of this question. The replications are, in this respect, altogether silent.   It is remarkable that they do not contain averments even of such negligence as would be necessary to subject the corporation in a civil action for individual mischief arising from non-repair.   In 2 *Chitty's..Pl.* 780, *Am. ed. of* 1828, the averment by the plain-tiff against an individual bound to repair is, that he *wilfully* and *unjustly* omitted to do so.   Formal words, such as *vi et armis* and *contra pacem,* can in no case, perhaps, be insisted on.   Such words may not be predicable of a corporation, even when it has been guilty of usurpation or other misfeasance ; and they are never introduced in charging mere non-feasance against individuals, unless it be contrary to some statute.   *Earl of Shrewsbury's case,* 9 *Rep.* 50.   The information is generally in nature of a mere civil suit, and the statute of amendments and jeofails is applicable to all proceedings under it.   2 *R. S.* 345, 2d ed. § 10.   Yet it is occasionally vindictive in its character, and may be followed by criminal punishment.   *Id.* 485, § 48.   In some cases of non-feasance, even of a criminal character, I perceive that no qualifying words are used in the indictment.   In Mr. Chitty's precedents of

[ *250 ]

indictments for nuisances arising from non-repair, the duty to repair and ruin. ous condition of the way, bridge, &c. are simply mentioned in general, without the imputation even of neglect.   *Vid.* 3 *Chit. Cr. Law, Am. ed.* 1836, *p*, 576 *to* 588.   At *p.* 586 is such an indictment against a corporation bound to repair by reason of tolls.   But the concluding indictments, which are against scavengers and rakers for not clearing the streets, *p.* 587, 8, impute neglect.   The form of indictments in this respect does not seem to be settled, though it is settled that particular defects cannot be relied on.   The indict. ment must aver that the road is in bad repair generally.   *Id.* 570, *a.*   Perhaps from such a state, neglect is necessarily implied ; but as a general rule, I should suppose *that an information or indictment    [ *251 ] ought, at least, to comprise so much as would be necessary to ground an action at the suit of an individual.   The law is certainly very strict where the duty is absolute and concerns the public.   It is said in *The Earl of Shrewsbury's case,* 9 *Rep* 50, that where an office of a liberty or franchise concerns the commonwealth, and the officer is bound to attend with. out request, the simple act of non-attendance is a ground of forfeiture.   But Mr. Chitty's precedents of indictments for acts of negligence by *ministerial officers* all contain qualifying words ; such as *unlawfully, obstinately, con. temptuously,* &c. or *not regarding the duty of his said office, nor the laws of this realm,* &c.   2 *Chit. Cr. L.* 254, *et seq. Am. ed.* 1826.   The case of the city of London furnishes no precedent for a charge of non-user, or non. feasance ; but in setting forth the misfeasance or abuser by usurpation in tak. ing toll, it was averred by the replication to have been done, *for the private gain and profit of the corporation, again the trust in a body corporate reposed,* and *on the assumption of an unlawful and unjust authority,* &c.   3 *Hargr. St. Tr.* 546.

In the cause under immediate examination, the seventh replication says, (and I am now supposing that the ground taken might in one view be suffi. cient,) " You have not, during all or any of the time mentioned in the in. formation, kept good the original *bedding* of the road ;" and the eighth, " You have not, during all or any part of that time, kept good the original *facing.*"   The time mentioned is five years next before the filing of the information, viz. March 20th, 1838.   The replications relate to the whole line and the whole required width of the improvements ; and should it appear, on an issue joined, that this company had failed in the course of the whole five years in any part of the whole length or breadth of the road, to maintain an exact mathematical conformity with the directions which governed in its original formation, though the failure arose from inevitable accident, this might be claimed to work a forfeiture of their charter.   A deep waggon rut, at any season of the year, for aught I see, would, on the principle taken, work a total disfranchisement.   It seems to me that where a *single act* or *omission* *is relied on, it should be characterized in pleading as    [ *252 ]

*wilful* or *negligent*, though a state of things may certainly exist where that is not necessary. The ground may . be taken that the exertions of the corporation are paralyzed by the dilapidated state of its affairs, or some other cause. In the last case, its dissolution is the consequence of such a disease as deranges and arrests the vital functions. In the former, it is ob. noxious to the sentence of civil death, as for some guilty act or neglect. It is not necessary to say that complaint of general non-repair, amounting to a nuisance, need aver neglect or any sort of *mala fides* ; but I cannot hesitate to deny that a *specific act* of non-feasance, not charged as having been com. mitted negligently, nor as carrying mischievous consequences to any human being, nor with a tendency to work such consequences, nor with being contrary to any requisition of the company's charter, shall be received to work its forfeiture. If I am mistaken in supposing that the seventh and eighth replications are so strict as to insist on any single act or neglect, still I am of opinion that they do not show a state of things at any time during the five years which can be allowed as a ground for dissolving the corporation. Confined as they are to a time subsequent to the governor's license, it is necessary, in my opinion, that they should at least show the road was at some time and at some place suffered to be out of repair contrary to the duty of the company.

To recapitulate : I am of opinion that the fifth and sixth replications, so far as they relate to the original construction of the road, allege causes of forfeiture sufficient in themselves, but 'that the state is *estopped* to make such allegations by the award of the commissioners and license of the governor. They cannot be sustained, on the ground that they also take in some of the time subsequent to the license being given. I am of opinion that the seventh and eighth replications are bad, as not stating any sufficient ground of forfeiture or dissolution subsequent to the time of the license being given. Though I agree that any wilful or negligent violation of a corporate trust such as taking excessive toll, or suffering a turnpike road to fall [ '253 ] into a state *of bad repair contrary to the duty of the corporation, or any single omission amounting to a breach of trust, would be adequate cause of forfeiture. I am of opinion that the tenth replication is bad, if for no other reason, yet because it does not show that any part of the road was so circumstanced as to require a *fender* or railing, the want of which alone is assigned as a cause of forfeiture. Circumstances requiring this mode of security for taavellers should be stated, before it can be seen that the duty to adopt it devolved on the company ; and it seems to me also that the particular part or parts of the road where the duty arose and was neglected should have been stated. This replication is moreover obnoxious to the same objections which lie against the others. The defect cannot be predicated of a time *anterior* to the award and license ; and after that, the question is rath. er one of general repair, than whether the fender or railing has at all times. been of a particular height, &c.

New–York, May, 1840.—People v. Bristol and Rensselaerville Turnpike Co.

In the course of my remarks, it will be perceived, that I have examined some questions not directly raised in this particular cause, and perhaps not either in *The People* v. *The Hillsdale and Chatham Turnpike Company*, or *The same* v. *The Kingston and Middletown Turnpike Company*. The latter causes were argued while the present one was under advisement; and we readily acceded to the request of the counsel in the first and the last argument, to hold both under consideration until the replications in each could be examined in the light of both arguments. With these we connected the intermediate cause, as presenting questions of a kindred character. My object has accordingly been now to state such considerations as I thought were called for by the points, or the course of the arguments bearing upon them in all three of the cases mentioned. In the course of my remarks now, therefore, I mean to be understood as having stated the prominent reasons upon which my own opinion will be governed not only in this but the other two cases.

My conclusion in this case is that judgment should be rendered against the people on all the demurrers.

*The CH. J. and BRONSON, J. concurred as to the seventh and    [ *254 ] eighth and tenth replications, but they were of opinion that the license does not conclude the people on this proceeding, for the reasons assigned by the CH. J. in *The People* v. *The Kingston and Middletown Turnpike Co.*, and consequently that the fifth and sixth replications are good. The result is judgment on demurrer, for the people on the fifth and sixth replications, and for the defendant on the seventh and eighth and tenth replications.