THE PEOPLE, *ex rel.* Moses M. Smith, *vs.* DEODATE PEASE.

The action in the nature of *quo warranto,* under the code, although differing in some of the formula of procedure, from proceedings by information or by writ of *quo warranto,* is nevertheless, in substance, the same, and is governed by all the rules which regulated the proceedings under the former practice.

Boards of inspectors of elections are not judges, nor do they exercise a judicial power, in receiving snd counting the votes and declaring the result. PRATT, P. J. and MULLIN, J. dissented.

It is competent for the legislature to make the inspectors of elections the sole and final judges of the qualifications of persons offering to vote. But it has not done so. The elector is made the judge of his own qualifications, and his conscience takes the place of the judgment and decision of every other tribunal, for that occasion. They may instruct and advise him, but they cannot decide upon his qualifications.

The statute prescribes in what case the inspectors may reject a vote, viz. upon

The People *v.* Pease.

the refusal of the party to take the oaths; and they can reject in no other case. *Expressio unius est exclusio alterius.*

The inspectors act ministerially, in determining whether they will receive or reject the vote.

Hence the question of the qualification of a person offering to vote is, like other questions, open to litigation in the courts, when the right of the voter is directly in issue, either in an action against the board of inspectors, for rejecting the vote, or for knowingly permitting a person to vote who is not qualified; or, in a proceeding properly instituted, to determine the right to an office,o r to punish the illegal voter. PRATT, P. J. and MULLIN, J. dissented.

Accordingly *held*, that in an action in the nature of a *quo warranto*, to try the title to an office, the defendant may give evidence tending to prove that a number of those who voted for the relator, and sufficient to change the result, were not properly qualified voters, or entitled to vote at the election. PRATT, P. J. and MULLIN, J. dissented.

The county courts of this state are courts of common law jurisdiction, and have jurisdiction in proceedings for the naturalization of aliens, under the act of congress. MULLIN, J., dissented.

THIS action, in the nature of a *quo warranto*, was brought to try the title to the office of county treasurer of the county of Lewis, and was tried before MULLIN, J. and a jury, and a verdict rendered for the defendant. At the election in November, 1857, the relator and the defendant were candidates of their respective parties for the office named. Of the votes cast, Moses M. Smith received 1683, Moses Smith 2, and M. M. Smith 17; Deodate Pease 1694, D Pease 3, and Deodate Beas 1. The inspectors of election rejected all the votes except those given for Moses M. Smith and Deodate Pease, and the county canvassers gave to the defendant a certificate of his election. Evidence was given upon the trial that the votes given for Moses Smith and for M. M. Smith were intended to be given for the relator, and which being allowed, gave him a majority over the defendant and entitled him to the office. The defendant then gave evidence, under objection and exception, tending to prove that a number of those who voted for the relator, and sufficient to change the result, were not properly qualified voters or entitled to vote at said election. Some of those so voting claimed to be naturalized citizens, having

been naturalized since 1847 in the county court of Lewis county; and the judge at the circuit held and decided, under objection, that such naturalization was void, the county court having no jurisdiction in the premises. Evidence was also given by the defendant, under objection and exception, tending to show that the naturalization papers of several of the persons so voting for the relator were forgeries, in this, to wit, that the original declaration of intention to become citizens had been made less than two years before their admission as citizens, and that the date of such declaration of intention had been fraudulently altered so as to give the court apparent jurisdiction to admit them. It does not appear that any question was submitted to the jury on this evidence. One witness, a foreigner, whose naturalization was void within the ruling of the judge, and who voted at the election of 1847, was asked who he voted for; and the question was objected to by the relator, for several reasons, and the objection was overruled. The witness then claimed to be privileged from answering the question, and the judge disallowed the claim and directed him to answer, and he testified that he voted for the relator. On cross-examination, he testified that he could not tell of whom he got the ballot; that he did not read it; and the defendant was then permitted to prove by this and by several other witnesses, for the purpose of showing that they voted for the relator, that they acted with the democratic party, (by whom the relator was nominated,) and that the persons handing them tickets represented them to be democratic tickets. This was objected to by the relator and admitted as evidence. A motion for a new trial was made, on a bill of exceptions, by direction of the judge, given upon the coming in of the verdict,

*J. F. Starbuck*, for the plaintiff.

*T. Jenkins*, for the defendant.

W. F. ALLEN, J. A *quo warranto*, for which this action is a substitute, is in the nature of a writ of right, and lies in

The People *v.* Pease.

behalf of the king, against him who usurps or claims any franchises or liberties, to say by what authority he claims. (3 *Bl. Com.* 262.) By statute, writs of *quo warranto* and informations in the nature of *quo warranto* are abolished, and an action is given in the name of the people when any person shall usurp, intrude into, or unlawfully hold or exercise, any public office, civil or military, or any franchise within the state, or any office in a corporation created by the authority of the state. (*Code*, §§ 428, 432.) The action under the code, although differing in some of the formula of procedure from proceedings by information or by writ of *quo warranto*, is nevertheless in substance the same, and is governed by all the rules which regulated the proceedings under the former practice. The proceeding, both now and formerly was, and is, intended to try the right of the defendant to the office possessed by him. The right of the adverse claimant may also be established in the same proceeding. (2 *R. S.* 582, §§ 30, 31.) As the name of the writ, from which the action derives its name and takes its peculiar characteristics, indicates, it is a proceeding in which the defendant is called upon to show his warrant for exercising the duties of the office or other franchise which he claims; and unless he pleads that he did not use the office, or sets up some matter in avoidance of the writ, upon the trial of the action the *onus probandi* lies upon the defendant, who must prove his title to the office. (*Cole on Quo Warranto*, 221.) The mere right to the office is tried, and not the use under color of right, which would be sufficient, ordinarily, to establish the right of the incumbent when collaterally questioned, and the defendant must rely on the strength of his own title. The only valid title to an elective office rests upon the choice of the electors, expressed in the prescribed method. No person can claim to be chosen to an elective office who has not received the votes of a majority of those qualified to vote, and who have voted at the election. He who is called upon to make title to an office under an election must in some way prove this, or he will be ousted. He

.may prove it in the first instance by the proper declaration or certificate of those whose duty it is to preside at the election or to canvass the votes. But acts of the presiding officers, or the certificate of the canvassers, have never been held conclu- sive in a proceeding brought directly to overthrow them. The election gives the right to the office, not the return. An ac- tion in the nature of a *quo warranto* is the only method for reviewing the acts of the officers and boards charged with the execution of the election laws, and it follows that unless for some reason of public policy they are made conclusive, and by a rigid rule of law are made to preclude all inquiry, they may be impeached by any evidence which will satisfy the judicial mind that they are not true. In other words, they are but *prima facie* evidence in favor of the incumbent, and may be shown to have been given under a mistake, or to have been procured by fraud, and by parity of reasoning that the ma- jority certified was made by the votes of those who were not qualified to vote, which would be only one way of showing that the claimant had not received a majority of the votes cast by the duly qualified electors. The very purpose of the writ fails if inquiry must stop any where short of the very truth and right of the case; and upon principle, there would seem to be no doubt that the proceeding necessarily opened up an inquiry into every fact which would tend to show who of the claimants, if either, was the choice of the electors. If the statute makes the action of the inspectors of election in receiv- ing and counting the ballots, or of canvassers in estimating and certifying the result, conclusive, the court has but so to say, and there will be but little difficulty in disposing of ac- tions of this nature. I can see many reasons why, with a view to the success and the permanence of our institutions in this, above all other countries, there should be the fullest and freest investigation in courts of justice, where facts can be properly investigated in regard to the validity and fairness of elections to public office; and I have been able to see no reasons of public policy which should exclude the people or any individ-

The People *v.* Pease.

ual interested, by the acts of the officers of election, or limit courts to a particular line of inquiry. It is conceded that inquiry may go behind the ballot box to ascertain the intent of the voter and with a view to give that intent effect, and yet to what good purpose if the vote chances to have been cast by a person not qualified, or if, being cast by a qualified voter, it may be balanced by an unqualified person into whose qualifications we may not inquire. Suppose upon this trial one of those who voted for M. M. Smith, after having testified that he intended the ballot for the relator, was proved to have been at the time a resident of New York city or an unnaturalized foreigner, would it be claimed that his ballot should be made good and counted for the relator by reason of his intention? I think not. The pains and penalties denounced by law against illegal voting and frauds upon the elective franchise have but little terror for those against whom they are aimed; but if those who seek to profit by these frauds find that they really gain nothing by them, and that offices obtained by such means are held by a frail tenure, it will remove the temptation to fraud. There is no tribunal by which frauds upon the ballot box can be investigated, except the judicial tribunals of the state, and there only in a way to redress the wrong upon the trial of the right of office in an action instituted for that purpose. It is urged that the action of the inspectors of election in receiving the ballots of those offering to vote is judicial, and their determination conclusive, as the judgment of a competent tribunal upon the qualifications of the voter. If it were true that the inspectors were judges, in this sense, I should hesitate to admit the conclusion that in this proceeding their acts and decisions which substantially affected the result could not be reviewed. It must be borne in mind that their decisions cannot be reviewed by writ of certiorari, nor in any other way except by *quo warranto*, and that such proceeding is designed solely to review the acts of the election boards, directly, and give such judgment as they should have given or might have given if they could have investigated the matter

and arrived at the truth. But when the courts held, as they have held in several cases, that they may upon extrinsic evidence reverse the acts and decisions of the board of inspectors, by allowing votes to the claimant which the inspectors had decided were not for him, and had disallowed, all idea of a judgment *conclusive* for any purpose in a proceeding brought directly to overthrow it, is gone. But I find no authority for holding that the board of inspectors are judges, or exercise a judicial power in receiving and counting the votes and declaring the result. It is true they are called upon to exercise their judgment, as every other public officer is. A county clerk acts ministerially when he records a deed, but he exercises his judgment in passing upon the genuineness of the certificate of the proof of acknowledgment of execution, its sufficiency in form, and the authority of the officer to take it. In *Ashby* v. *White*, (2 *Ld. Raym.* 938,) which was an action against returning officers at an election for members of parliament, for refusing to admit the vote of the plaintiff, Gould, J. was of the opinion that the defendants were judges at the election, and therefore the action would not lie ; Powys, J. thought they were not judges, but quasi judges, and were not liable to an action. Powell, J. said, "I do not agree with my brothers upon their first reason that the defendant is a judge. I do not understand what my brother Powys means by saying he is quasi a judge ; seeing he must be a judge, or no judge ;" but for other reasons he thought the action would not lie. Holt, chief justice, said, "but my brother Powell is of opinion that the defendant neither is a judge nor any thing like a judge, and that is true ;" and he was of opinion that the action would lie for a willful rejection of the vote of an elector, and his opinion was sustained by the house of lords, reversing the judgment given by a majority of the judges. In a like case in our own court, following *Ashby* v. *White*, it was held that officers required by law to exercise their judgments were not answerable for mistakes in law, or mere errors of judgment, without fraud or malice. But inspectors of election were not distinguished from any

The People *v.* Pease.

other officers who are not judges, or "any thing like judges." (*Jenkins* v. *Waldron*, 11 *John.* 114.) For a strictly judicial act no action will lie. (*Moor* v. *Ames*, 3 *Caines*, 170.) The duty may be so far judicial in its nature as to protect the officer from liability for error of judgment, and yet not give his acts the character of a judgment and conclude all inquiry into their correctness when brought directly in question. (*Wilson* v. *Mayor of New York*, 1 *Denio*, 595.) In some matters inferior tribunals are made judges, and their decision is final, in matters within their jurisdiction. (*Wood* v. *Peake*, 8 *John.* 69. *Van Wormer* v. *Albany*, 15 *Wend.* 262.) It was competent for the legislature to make the inspectors of election the sole and final judges of the qualifications of persons offering to vote. But if they have not, then like other questions it is open to litigation in the courts when the right of the voter is directly in issue, either in an action against the board, for rejecting the vote, or for knowingly permitting a person to vote who is not qualified; or, in a proceeding properly instituted, to determine the right to an office or to punish the illegal voter. The qualifications of voters are prescribed by the constitution, article 2, and the laws enacted in pursuance of it, and an election to office by persons assuming to vote who are not thus qualified is no election at all. It is very evident that neither the inspectors of election nor the canvassers, either state or county, have the means of investigating and determining the qualifications of voters. They cannot summon witnesses, or empannel a jury, or give the parties interested a hearing. They can examine the proposed elector upon his oath, and there their power and means of judicial investigation cease, and it would be strange indeed if their conclusions should be final as against the state and all interested. The returns of election inspectors are deemed ministerial and not judicial acts, and hence they have been scrutinized with great freedom in proceedings by mandamus, informations in the nature of a *quo warranto*, &c. (*Ex parte Heath*, 3 *Hill*, 42.) Their acts in receiving the ballots offered are no less ministerial than in

making their returns. "On a given concurrence of circum-stances well defined by constitution or statute, they are bound to receive and count votes and give certificates of election. They have no more discretion than a sheriff in disposing of real estate upon execution. They may have judicial powers conferred upon them, and then their certificate becomes conclusive." (*Per Cowen, J., in People* v. *Bristol and Rensselaer-ville Turnpike Co.*, 23 *Wend.* 228.) In South Carolina, in cases of contested elections, the managers of the election have authority to hear and determine the contest, and in such case their decision is final. (*The State* v. *Deliesseline*, 1 *McCord*, 52.) The statute in this state vests no discretion with the inspectors of election, whether to receive or reject the vote offered, if the party offering the vote submits to take the oath prescribed by law. It is true they may, at their peril, reject a vote, and proof that the person offering it was not an elector entitled to vote will be a justification; and if they knowingly and willfully permit a person to vote who is not entitled to vote, they shall be adjudged guilty of a misdemeanor. (*Laws of* 1847, *ch.* 240, § 16.) The act regulating elections prescribes two oaths to be administered to any person offering to vote, whose right to vote is challenged. If a person refuse to take either, his vote shall be rejected. The first is preliminary, and is to answer such questions as shall be put to him. If from his answers the inspectors deem him not qualified to vote, they shall point out to him in what respect he is deficient in qualifications, and then if he persists in his claim to vote, the general oath is to be tendered to him; and if he refuse to take it, his vote shall be rejected; but if he takes the oath prescribed, the inspectors must receive his vote. (2 *R. S.* 430, § 18 *et seq.* 5*th ed.*) The elector is made the judge of his own qualifications, and his conscience takes the place of the judgment and decision of every other tribunal, for that occasion. The inspectors may probe his conscience and instruct and advise, but they cannot decide upon his qualifications. The statute prescribes in what case they may reject a vote; they can re-

ject in no other case. *Expressio unius est exclusio alterius.*
The rejection is upon the refusal of the party to take the
oaths, and the inspectors act ministerially, whether they re-
ceive or reject the vote. If any part of the duties of inspect-
ors are judicial, it is in determining whether or not by a given
ballot a certain candidate is indicated, and yet courts have
gone behind their acts, and "behind the ballot box," as it is
expressed, and decided upon the intent of the elector as mani-
fested by his ballot. And this is the extent to which our
courts have been called upon to go, hitherto. But in princi-
ple, it involves an inquiry into every proceeding and every act
which can influence the result. In England the rule is estab-
lished that upon an issue as to the right of an individual to
an elective office, in answer to the prima facie case made by
showing the result as declared by the presiding officers at the
election, it may be shown that some of the votes counted for
the incumbent were fraudulent, and that some of the voters
were not qualified. (*Reg.* v. *Ledyard,* 8 *A. & E.* 535. *Reg.*
v. *Quayle,* 11 *id.* 508.) And in *Inhabitants, &c. of Sud-
bury* v. *Stearns,* (21 *Pick.* 148,) which was an action of trover
for the records of the parish, in which the right of the defend-
ant to the office of clerk, and the consequent right to the pos-
session of the books was contested, the court inquired into the
qualifications of the voters, with a view to determine whether
he received a majority of the votes cast by the qualified electors
who voted at the election. But little aid can be derived from
the random and casual remarks of judges, able and learned
though they be, which might seem to bear upon the question
more or less remotely, when the remark has not been necessary
to the decision of the case in hand. It would not therefore
be profitable to quote at length the incidental remarks of
judges in cases not involving the right to go behind the act of
the inspectors in admitting a vote, although the right does
not seem to have been any where questioned by any one, but
rather conceded. In *The People* v. *Seaman,* (5 *Denio,* 409,)
the court went behind the determination of the inspectors,

and also the decision of justices of the peace, that there was a vacancy, which could not be questioned collaterally, (*Wood* v. *Peake, supra; Wildy* v. *Washburn,* 16 *John. R.* 49,) and decided that a ballot which had been rejected was intended for one of the candidates, which being allowed him, gave him the office, displacing the officer that had been appointed by the justices upon the ground that there had been no election. Whittlesey, J. says: "We can look behind the certificate to see whether the canvass of the presiding officers was correct: whether they allowed the proper votes," &c. ; that is, allowed votes in proper form deposited by qualified voters, for none other are "*proper* votes." A vote deposited by a party falsely personating an elector, is not a proper vote. Neither is a vote given by a minor a proper vote; and yet the claim is, that if they can be smuggled into the box, they become "*proper votes,*" and no power exists any where to redress the wrong.

It is implied from *Ex parte Murphy,* (7 *Cow.* 153,) that improper votes will vitiate an election where, if rejected, the result would have been changed. Woodworth, J. in *The People* v. *Van Slyck* (4 *Cow.* 323,) says: "The acts of canvassers are ministerial, and the court will decide upon the right of a party to hold office, upon an examination of all the facts." Van Vechten, arguendo in that case, says: "The question is, whether the defendant was elected or canvassed into office. If the latter, he is not sheriff." There, as here, the struggle was to make the acts of the presiding officers at the election judicial, and conclude all parties. The estoppel was not allowed. The right to overhaul the legality of election proceedings by *quo warranto*, is expressly conceded by Bronson, J. in *People* v. *Jones,* (17 *Wend.* 81.) It was the question of the legality of the whole election, whether properly held or not, that he spoke of, as evil in its consequences. Speaking of proceedings by information in the nature of *quo warranto*, the same judge, in *The People* v. *Vail,* (20 *id.* 12,) says: "It reaches beyond these evidences of title, which are conclusive

The People *v.* Pease.

for every other purpose; inquires into and ascertains the abstract question of right." In *The People* v. *Cook*, (14 *Barb.* 259; *S. C.* 6 *Seld.* 67,) stress is laid on the opinions of the judges, especially in the court of appeals, that it is no where claimed or pretended that by reason of the irregularities complained of, legal votes had been rejected, or illegal votes received; clearly implying, that if such fact had been made to appear, the result might have been different, and that the qualifications of voters was the proper subject of inquiry with a view to determine upon the abstract right to an office. (*See* 4 *Seld.* 86, 91.) The judgment spoken of by the learned judge, in 14 *Barb.* 326, is the judgment of the electors—those qualified to vote, and who have voted—not of the presiding officers of the election, the mere registers of the will of the electors. The judge was right in permitting the defendant to give evidence of the qualifications of the persons whose votes, if allowed, would give the relator a majority. There is no such premium upon fraud, as would be held out by the impunity claimed for it, in the absence of all power in the courts to investigate it.

The principal objection to the right to vote of those whose qualifications were questioned upon the trial, was that they were foreigners, and had been naturalized in the county court of Lewis county, and not otherwise; and it was ruled by the judge at the circuit that the county courts of the state had no common law jurisdiction, and that therefore the proceeding was void and conferred no rights of citizenship upon the individual. It is proper to remark that we are not embarrassed by *The People* v. *Sweetman*, (3 *Park. Cr. R.* 358,) for the reason that the question was purposely left undecided. The opinion of Judge Pratt, as reported, was read and adopted, and the questions involved here were not considered. In the opinion written by me, not reported, I stated my impression, but it was a mere impression, and the question was not considered or examined with any care. There were so many

other questions in that case, fatal to the conviction, that it was not necessary to pass upon doubtful ones.

The question now before us was expressly left an open question. By the act of congress of 1802, (2 *U. S. Stat. at Large,* 153,) every court of record in any individual state having common law jurisdiction and a seal and clerk, or prothonotary, has jurisdiction to admit aliens to the rights of citizenship. The county court, as a court of civil jurisdiction, succeeds to the old court of common pleas, which was coeval with the earliest judicature of the colony of New York. It was first established with jurisdiction " to hear, try, and finally to determine all actions, or causes of action, and all matters and things, and causes triable at common law of what nature or kind soever." (2 *R. L. App. No.* 5.) From that period to the adoption of the constitution of 1846, they continued to exercise substantially the same powers with which they were originally invested, with such modifications only as were rendered necessary by the constitutions of 1777 and 1821. These instruments do not prescribe the nature or extent of the jurisdiction of the court of common pleas, but left it for the legislature to regulate. The courts were reorganized by the revised statutes, which provided that there should be a court of common pleas in each county of the state, which should possess the powers, and exercise the jurisdiction, which belonged to the courts of common pleas of the several counties in the colony of New York, with the additions, limitations and exceptions created and imposed by the constitution and laws of the state. (2 *R. S.* 208, § 1.) It was left and remained a court of common law, with original jurisdiction, up to the time when the constitution of 1846 became the fundamental law of the state. Its name was borrowed from a court in existence in England which had general civil jurisdiction in causes between subject and subject. (1 *Bl. Com.* 23 ; 3*d ed.* 40.) The constitution of 1846, by implication, changes the name of the court from " common pleas" to " county court ;" but it can hardly be inferred that it was intended to make a corres-

The People v. Pease.

ponding change in their jurisdiction in reference to a court of the same name in England. The county court there is held by the sheriff, is limited in its jurisdiction to pleas of debt or damages under the value of forty shillings, and is not a court of record. (1 *Bl. Com.* 178; 3 *id.* 35.) The county court of the constitution of 1846 is a court of record, and is not limited to the trial of small causes. The name was chosen with reference to its local and territorial jurisdiction, and not to indicate the character of its jurisdiction within its territorial limits. The constitution of 1846 declares that the county court shall have such jurisdiction in cases arising in justices' courts, and in special cases, as the legislature may prescribe; but shall have no original civil jurisdiction except in such special cases. (*Const. art.* 5, § 14.) The constitution only limits the power of the legislature in conferring original civil jurisdiction on the court, and does not prescribe the character or extent of jurisdiction other than original, which it may, under the legislative sanction, exercise. What constitutes a "special case" within this clause of the constitution is in great doubt; eminent jurists differing as to its true interpretation, and the court of appeals being as yet unable to fix upon a classification or definition by which the "special cases" may be distinguished from ordinary actions, cognizance of which the court cannot take. It was for a time supposed that the legislature could authorize it to take jurisdiction over ordinary common law actions, under circumstances prescribed by it. (*Beecher* v. *Allen*, 5 *Barb.* 169.) It was finally decided that an action for assault and battery was not a "special case," although the parties resided in the county and the damage claimed did not exceed 500 dollars; and the reporter says, in his head note to *Kundolf* v. *Thalheimer*, (2 *Kernan*, 593,) "It seems that the county court has not jurisdiction in any of the ordinary common law actions." It has now been decided that those courts have jurisdiction in cases of partition, and in actions to foreclose mortgages. (*Arnold* v. *Rees*, 18 *N. Y. Rep.* 57. *Doubleday* v. *Heath*, 16 *id.* 80.) Judge Com-

stock, in *Arnold* v. *Rees*, says, "It would seem impossible, therefore, to hold that the constitution, in providing for jurisdiction in special cases to be prescribed by the legislature, has excluded all the remedies which were pursued by actions at common law," which is adverse to the reporter's *semble* in *Kundolf* v. *Thalheimer*. The uncertainty and doubt which has rested upon the power of the legislature to give the county court jurisdiction has greatly obstructed the usefulness of the court, and they can only be removed by adjudication of the court of appeals, as cases arise from time to time. But it is concerning original jurisdiction only that there is any doubt. There is no restriction upon the legislature as to any other jurisdiction. By the constitution, article 14, § 5, suits pending in the common pleas, and regularly commenced in justices' courts, were required to be transferred to the county courts provided for in that constitution. And by the judiciary act of 1847, all proceedings in such suits were transferred to, and vested in, the proper county court. (*Laws of* 1847, *p.* 329, § 35.) Then, as now, in any action commenced before a justice of the peace, the defendant might interpose the plea that the title to lands would come in question, and upon doing so, and giving the bond prescribed by statute, an action for the same cause might be commenced in the court of common pleas. (2 *R. S.* 236, §§ 59 *et seq.*) A justice of the peace had no jurisdiction other than of common law actions. It was exclusively "a common law jurisdiction." The same actions when continued in the court of common pleas were common law actions, and the court taking cognizance of them exercised "common law jurisdiction." Such actions were among those originally commenced in a justice's court, and by the very terms of the constitution were transferred to, and the jurisdiction therein vested in, the county court, which of itself, and without further legislation, brought the court within the requirements of the act of congress as a court "having common law jurisdiction." (*Brown* v. *Brown*, 2 *Seld.* 106.)

No legislation can deprive the court of this characteristic

The People *v.* Pease.

until this provision of the constitution is abrogated. It is not necessary to show that a single cause is pending, which was thus transferred. The jurisdiction is there, whether it has occasion to exercise it or not. By the code, as amended in 1851, suits commenced in a justice's court were authorized to be continued in the county court, whenever it appeared by the answer of the defendant that the title to lands would come in question. (*Code of* 1851, § 55, *&c.*) This act was constitutional, and conferred jurisdiction upon the county court over common law actions thereafter to be brought. (*Cook* v. *Nellis,* 18 *N. Y. Rep.* 126.) This act continued in force until 1858; so that under this law the court actually exercised common law jurisdiction from 1851 to 1858 in this class of cases. So partition, and some of the other remedies which are confessedly within the jurisdiction of the county court, are known to the common law in which courts of law and equity had concurrent jurisdiction. (4 *Bouv. Inst.* 232.) A writ of partition lay at common law. (2 *Black. Com.* 189.) So the proceeding to admeasure dower was a common law proceeding, &c. Again, the county court has common law jurisdiction in the revision of all judgments given in justices' courts. The court of appeals is a court of general common law jurisdiction, and yet it has no original jurisdiction. The county court, as an appellate court, is in like manner a court "having common law jurisdiction." The police court of Lowell which was authorized to hear and determine all complaints and prosecutions in like manner as justices of the peace, and had jurisdiction of all civil suits and actions cognizable by a justice of the peace, and had a seal and a clerk, was held to have authority under the act of congress to naturalize aliens. (*Ex parte Gladhill,* 8 *Metc.* 168.) We are also cited to a decision of Judge McLean in *re M. Smith,* said to have been made in 1859 and to be published in 3d volume *Law Gazette, p.* 237, to the effect that the probate courts for the several counties in Ohio had jurisdiction in naturalization proceedings. For more than ten years the county courts of this state have as-

sumed jurisdiction to admit aliens to naturalization, and thousands have been naturalized by them; and to hold at this day that they had no jurisdiction would be fruitful of mischief, creating doubts and uncertainty as to civil and personal rights, endangering titles to property, and in many instances, perhaps, destroying inheritances and changing the course of descent.

If there is a doubt as to the jurisdiction we ought not to yield to it, except upon the clearest evidence that it is well founded. But I entertain no doubt, and am of the opinion that the county court is a court of common law jurisdiction and has jurisdiction in naturalization proceedings, under the act of congress.

The judge at the trial also suffered the party to attack the certificate of naturalization by evidence aliunde, and to show that it was procured by fraud; that its recitals were false, and that the party was not entitled to be naturalized. The certificate was the legal evidence of the judgment of a court of competent jurisdiction collaterally in question in the action. It was final and conclusive. It imported absolute verity, and could not, if valid on its face, be thus impeached in this action. When alienage is in issue, the judgment of the court admitting the alien to become a citizen is conclusive evidence upon that point. (*Ritchie* v. *Putnam*, 13 *Wend.* 524.) A record of naturalization cannot be contradicted by extrinsic proof that no declaration of intention had in truth been made. (*Banks* v. *Walker*, 3 *Barb. Ch. Rep.* 438.) Like any other judgment, it is complete evidence of its own validity. (*Spratt* v. *Spratt*, 4 *Peters*, 393.) This erroneous ruling does not appear to have affected the result, but as an exception was taken to the admission of the evidence, it is proper to pass upon it with a view to govern any future trial of the action. There must be a new trial granted; costs to abide the event.

Bacon, J. concurred.

Pratt, P. J. was of the opinion that the qualifications of those who had voted at an election could not be inquired into

upon the trial of a right to an office, in an action in the nature of a *quo warranto;* that the action of inspectors, in receiving the ballot, was conclusive; and concurred in the remaining propositions put forth in the opinion.

MULLIN, J. dissented.

New trial granted.

[ONONDAGA GENERAL TERM, January 3, 1860. *Pratt, Bacon, W. F. Allen* and *Mullin*, Justices.]