### PEOPLE *ex rel.* STAPLETON *et al.* v. BELL *et al.*

*(Supreme Court, Special Term, Rensselaer County.* November 18, 1889.)

1. ELECTIONS AND VOTERS—INSPECTORS—DUTY TO CERTIFY RETURNS.
   Inspectors of elections exercise ministerial and not judicial powers, and *mandamus* will lie against them to certify election returns, as prescribed by Rev. St. N. Y. (7th Ed.) p. 388, art. 4, though some of the votes may have been illegally cast.
2. SAME—QUALIFICATIONS OF VOTERS.
   Where a person who is not shown of record to have been convicted of a crime takes the oath prescribed by statute, the inspectors must receive his vote, notwithstanding anything they may believe or know of his want of qualification.

Application for *mandamus.*

*R. A. Parmenter* and *Lewis E. Griffith,* for the motion. *George B. Wellington,* opposed.

EDWARDS, J. This motion is brought on by an order of Mr. Justice MAYHAM, requiring the defendants to show cause at this special term why a writ of *mandamus* should not issue to compel them to sign the last election returns from the Ninth ward of the city of Troy. The relators and the defendants are the four duly-appointed inspectors of election for said ward, and acted as such at the general election, held on the 5th day of November last. The law regulating the canvass and estimates of votes by inspectors requires that "as soon as the poll of an election shall have been finally closed, the inspectors of the said election, in their several districts, shall proceed to canvass the votes. Each box being opened, the ballots contained therein shall be taken out and counted, unopened, except so far as to ascertain that each ballot is single. The canvass shall be completed by ascertaining how many ballots of the same kind, corresponding in respect to the names of persons thereon, and the offices for which they are designated, have been received; and, the result being found, the inspectors shall securely attach to a statement of such canvass one ballot of each kind found to have been given for the officers to be chosen at such election," etc. At the completion of the canvass of each box the chairman of the inspector of election shall make public oral proclamation of the whole number of votes in such box, and of the whole number given for each person, with the name of the office to which such person was named on the ballots. "The statements to be made by the inspectors shall contain a caption, stating the day on which, and the number of the district, the town or ward, and the county at which, the election was held, in relation to which such statement shall be made. It shall also contain a statement showing the whole number of ballots taken for each person, designating the office for which they are given, which statement shall be written in words at length, and at the end thereof a certificate that such statement is correct in all re-

.spects, which certificate shall be subscribed by the inspectors." Election Laws, §§ 286–302.[1]  The statute there provides for the filing of such statements, commonly called the "election returns."

The affidavit of the relators, on which the order to show cause is based, shows that, immediately after the closing of the polls, the said four inspectors proceeded to canvass the votes in the form required by the foregoing statutes; that they counted the ballots cast by the electors, proclaimed the result of their counting, the whole number of votes cast, and the number received by each candidate for office; that such results, number of votes cast, and number received by each candidate, so proclaimed by the inspectors, are the same in every particular as contained in the statement or election returns from said ward now on file in the office of the clerk of the county of Rensselaer; that after such proclamation the two relators signed their names to such election returns, but the defendants refused, and still refuse, to sign the same.

These allegations of the relators are not controverted by the defendants. They do not deny that the whole number of votes contained in each box at the close of the polls, and the votes found therein for each candidate, were correctly counted, nor that the election returns which they refuse to sign correctly state such count. They base their refusal to sign solely on frauds alleged to have been committed before the polls closed, and the canvassing began. Chief of these were votes cast by persons falsely representing themselves to be registered voters, and by repeaters. It is further charged that in many instances persons challenged, to whom the oath was administered, did not give satisfactory answers to the defendants, and the relators persisted, against the protests of the defendants, in putting such votes into the ballot-box.

For the purposes of this motion these allegations of fraud must be deemed to be true; but however much we may deplore and condemn their existence, do they absolve the inspectors from the duty enjoined by statute to make and sign the returns? The questions presented on this motion are purely legal. Courts must apply the law as they find it, and not as they would make it for a particular emergency.

It is conceded that the solution of the problem before us depends entirely upon the question whether the acts of the inspectors are judicial or merely ministerial. Have they power to pass judicially upon the validity of any of the votes contained in the box, or are their duties restricted to the merely ministerial acts of making the count of such votes, and a correct statement thereof? If they act judicially, the writ of *mandamus* will not lie; if ministerially, the writ should issue to compel them to do the duty enjoined by statute. This supposition is undisputed. I am very clear, both on principle and on authority, that their acts are purely ministerial. We search in vain in the statutes for any authority to the inspectors to judicially determine the legality of any of the votes contained in the ballot-boxes. But we are not without express adjudication to this question. In *People* v. *Pease*, 30 Barb. 588, (affirmed by the court of appeals,) the court say: "But I find no authority for holding that the board of inspectors are judges, or exercise a judicial power in receiving and counting the votes, and declaring the result. * * * The returns of election inspectors are deemed ministerial, and not judicial, acts. * * * Their acts in receiving the ballots offered are no less ministerial than in making their returns." In the same case (27 N. Y. 45) the court of appeals say: "Their duties, except in the single instance adverted to, are simply ministerial in the reception of the votes, and entirely so in counting and making returns thereof. The legislature have left to those bodies having the power to judge of the return and election of their own mem-

[1] Rev. St. N. Y. (7th Ed.) p. 388, art. 4.

'bers to correct any abuses which may have resulted in such election, and to judicial investigation, where the legal rights of individuals are concerned or .affected, to apply such remedies as the nature of the case calls for." These .adjudications upon the power of the inspectors in counting the votes and making returns thereof must be regarded as conclusive.

But the main contention of the learned counsel for the defendants arises ·out of the claims on the part of the defendants that the votes of persons challenged and sworn were put into the boxes by the relators against the protest ·of the defendants. The defendants' affidavits allege that persons who did not reside within the election district falsely personated registered voters, were challenged and sworn. Their answers were unsatisfactory. Defendants refused to receive their votes, but the relators put such votes into the boxes. It is contended that such votes, although put into the boxes, were not re-·ceived by the board of inspectors; that the acts of the relators, against the will of the defendants, were not the acts of a majority of the board, and were therefore nugatory; that the votes, although in the box, were not legally re-·ceived. On this they base a claim that the returns are incorrect, in that there were not received the number of votes therein stated, for the reason that the .alleged fraudulent votes were not, in law, received. In brief, they admit that the returns correctly state the whole number of votes contained in each box, and the number found there for the respective candidates; but insist, for ·the reasons stated, that such votes were not received within the meaning of the statute. If the conclusion which I have reached in respect to the duties ·of the inspectors, sitting as a board of canvassers, is correct, I think this ob-.jection of the defendants is unavailing. It is simply another form of statement that some of the votes in the box were not legally there, and the inspectors, as canvassers, were judicially determining that question. If they act ministerially only, their duties are restricted to counting the votes contained in each box at the close of the polls, and the number of votes·cast for the respective candidates; and they have no power to pass judicially upon the validity or invalidity of any of such votes. Furthermore, the defendants had no power to reject the votes of persons challenged, because their answers were "not satisfactory." It is not claimed that such voters refused to take the statutory ·oath, but that their answers were not satisfactory. In the case of *People* v. *Pease,* 27 N. Y. 45, the court of appeals says: "The course required by the statute to be pursued where the right of any person to vote is challenged cannot be reconciled with any discretionary power of rejection vested in the inspectors. The inspectors are first to administer what is called the 'preliminary oath,' requiring the person offering the vote to answer such questions as shall be put to him touching his place of residence and qualifications as an elector. The statute then mentions several questions which are to be addressed to him by the inspectors, and authorize such other questions as may tend to test his qualifications as a voter. If he refuses to take..the oath, or to answer fully, his vote is to be rejected; but, if he answers fully, the inspectors are required to point out to him the qualifications, if any, in which he shall appear to be deficient. If he still persists in his right to vote, and the challenge is not withdrawn, the inspectors are required to administer to him the general oath, in which he states in detail, and swears, that he pos-.sesses all the qualifications which the constitution and laws require the voter to possess. If he refuses to take the oath, his vote shall be rejected. Is not the inference irresistible that if he takes the oath his vote shall ·be received? If his vote is to be rejected after he takes the oath, why not reject it before? As I construe the statutes, the inspectors have no discretion left to them in such a case, when the person offering to vote is not shown by a record to have been convicted of crime, or by his own oath to be interested in a bet upon the election, but must deposit the ballot in the box, whatever they may .believe or know of the want of qualifications of the voter. They are required

to act upon the evidence which the statute prescribes, and have no judicial power to pass upon the question of its truth or falsehood, nor can they act upon their own opinions or knowledge. These are all the safe-guards the legislature have thought proper to provide to insure the prevention of fraudulent or illegal voting."

Although grievous offenses have been committed against the elective franchise, it is not difficult to conceive of greater evils which might result from the principle for which the defendants contend. If inspectors of election could be absolved from their statutory duty to sign the returns because they have reason to believe that some of the votes in the box had been fraudulently cast, or had been illegally deposited, they could practically disfranchise the legal electors of their district, and nullify the expressed will of the majority. If because, in their judgment, there are 25 fraudulent votes among the 500, they may refuse to make returns, they may also refuse because of the existence of one such fraudulent vote, and thus throw out the entire district. The prevalence of such a doctrine and practice throughout the state would open a vast field for fraud. It might practically disfranchise the qualified electors of the state, and nullify an election. I think it quite clear that the inspectors are not clothed with such power. If illegal and fraudulent votes have been cast, the party injured is not remediless. It is settled in this state that the returns are not conclusive. The injured candidate may maintain in the courts an action of *quo warranto*, judicially investigate the alleged frauds, and obtain redress. As was said by the court in the case of *People* v. *Pease:* "There is no tribunal by which frauds upon the ballot-box can be investigated except the judicial tribunals of the state, and there only in a way to redress the wrong, upon the trial of the right of office, in an action instituted for that purpose.".

In my judgment it was the plain duty of the defendants to sign the returns, and the writ of *mandamus* should issue to compel them to discharge that duty.